Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer between June 24, 1968 and June 30, 1993.
3. Travelers Insurance Company of Illinois was the workers compensation carrier for defendant-employer from October 31, 1991 until plaintiffs retirement on June 30, 1993. Liberty Mutual Insurance Company was the workers compensation carrier for defendant-employer from October 31, 1980 through October 31, 1991. Zurich-American Insurance Company, National Union Fire Insurance and Twin City Fire Insurance Company also provided coverage during plaintiffs employment with defendant-employer; however, plaintiffs claim as to these carriers has been settled.
4. Plaintiffs average weekly wage was $611.49, yielding a compensation rate of $470.66.
5. The parties stipulated into evidence as Stipulated Exhibit 1, without need for further authentication or verification, plaintiffs medical records from various medical providers, an I.C. Form 22, asbestos identification surveys from defendant-employer and plaintiffs medical records from defendant-employer.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner with some modifications and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 68-year-old male who had completed the seventh grade. Plaintiff became employed with defendant-employer on June 24, 1968 where he worked as a pipe fitter and insulator until his retirement on June 30, 1993. Defendant-employer is a large company that makes chemicals and dyes of all types and has approximately 300 to 400 miles of piping in the facility in which plaintiff was employed.
2. Throughout plaintiffs employment with defendant-employer plaintiff insulated; however, the majority of his insulating duties were performed in the earlier years of his employment. Most of the pipe in defendant-employers facility was insulated, as were many of the tanks, boilers and vessels. In addition to insulation, the exterior of most of the buildings at defendant-employers facility was covered with transite, an asbestos siding. In addition to insulating, plaintiff fitted pipes, dug ditches, laid concrete and tore down old pipes. There were over 50 buildings at defendant-employers facility and over his career plaintiff worked in every one of them.
3. During the early years of plaintiffs employment with defendant-employer, the insulation that plaintiff installed or removed on pipes, tanks, boilers and other areas contained asbestos. Even after asbestos was no longer manufactured, plaintiff continued to install asbestos insulation as defendant-employer stored large quantities of it in buildings 4 and 43.
4. As part of plaintiffs regular duties, he had to check the thickness of pipes to avoid rupture. Plaintiff was required to beat the asbestos insulation off the pipe, sand the pipe smooth of all the insulation and take a reading. If the thickness of the pipe was insufficient, plaintiff removed the insulation from the thin section of the pipe, cut the section of pipe out and replaced it with new pipe. The asbestos insulation on the old pipe was then stripped off so that the old pipe could be taken to a salvage yard for sale. Due to the nature of defendant-employers business, piping did not last long and plaintiff stripped insulation off pipes three to four times a week from 1980 to 1993.
5. The exterior of most of the buildings at defendant-employers facility was covered with transite, an asbestos siding. This siding was not removed until the late 1980s or early 1990s. Plaintiff worked with the transite siding by cutting it with saws or drilling holes in it for pipes to be placed through the buildings. This work created a large amount of asbestos dust.
6. Plaintiff worked with asbestos gasket material on a daily basis. Plaintiff usually cut his own gaskets from four by eight sheets which caused the release of asbestos dust. Even more asbestos dust was created when old gaskets were removed, as the gaskets got hard and stuck to the pipe. Plaintiff used a hammer and chisel to remove the old asbestos gasket and then sanded the area smooth before a new gasket was installed. Asbestos gaskets remained in use at defendant-employers facility as late as 1993.
7. Plaintiff made covers for pumps by cutting asbestos block to make the cover. Cutting the asbestos block caused asbestos dust to fly from it. Plaintiff made asbestos mud and mixed it to put around the joints.
8. Plaintiff also worked with rotary drums which were approximately twelve feet high and eight feet wide. Plaintiff insulated these drums with asbestos block. On quite a few occasions he removed the asbestos insulation in order to patch the rotary drum and repair it. He then re-insulated the rotary drum. When a rotary drum wore out, plaintiff removed the transite roof. A crane then pulled out the rotary drum. Plaintiff then chiseled and beat off the asbestos insulation from the old rotary drum before the drum was discarded.
9. In the late 1980s, buildings 2 and 7 were demolished, as was a part of building 16. It took three to five months each to take down buildings 2 and 7 and approximately three months to take down part of building 16. In taking down the building, plaintiff first took down all of the piping. The pipes were sawed and the insulation was stripped off. All the equipment was removed and the transite siding was beaten off with hammers. There was not a single day during these demolition projects that plaintiff was not exposed to asbestos because it was being knocked down everywhere and it was so dusty that workers could hardly see.
10. Defendant-employers asbestos identification surveys indicate that as late as 1993 there was still asbestos-containing material in all of the buildings and locations where plaintiff was required to work on a daily basis.
11. Plaintiff frequently worked in the salvage yard. When the pipes, vessels, or other materials were removed from defendant-employers facility, these materials were taken to the salvage yard. All of the insulation had to be removed prior to sale of the salvaged materials. Plaintiff worked in the salvage yard stripping tanks and pipes, exposing him to large amounts of asbestos.
12. Plaintiff was exposed to asbestos until the day that he retired. Between 1980 and 1993 plaintiff had hands-on contact with asbestos insulation during approximately 90% of his days of employment at the facility.
13. In January 1995, plaintiff had a chest x-ray prior to prostate surgery. Since the chest x-ray showed some abnormalities, a limited CT scan was performed which revealed pleural calcified areas which were consistent with plaintiffs previous asbestos exposure. There was no evidence of primary pulmonary neoplasimal mesothelioma.
14. Plaintiff was examined by Dr. Douglas G. Kelling, Jr., a board-certified internist and pulmonologist, on August 24, 1995. Plaintiff gave Dr. Kelling a history of exposure to asbestos for 25 years in construction work. Dr. Kelling noted that plaintiffs chest x-ray in 1994 showed moderate pulmonary parenchymal disease which was unchanged from an x-ray done in 1993; that plaintiffs 1995 CT scan showed calcified pleural plaques that are "highly suggestive of, almost virtually diagnostic of, pleural changes from exposure to asbestos, which has been inhaled; that plaintiff has a Class II pulmonary impairment which is mainly restrictive in nature; and that the restrictive nature of plaintiffs disease is important because "asbestosis, which is pulmonary fibrosis caused by exposure to asbestos, classically produces a restrictive pattern. Dr. Kelling diagnosed plaintiff with asbestosis.
15. Dr. Caroline Chiles of Bowman Gray School of Medicine reviewed plaintiffs April 7, 1997 CT scan. Dr. Chiles found "numerous calcified and non-calcified pleural plaques bilaterally. The most heavily calcified and largest plaque is over the right hemi-diaphragm. The plaques in some areas appear somewhat nodular. There are short subpleural lines arterially in the nondependent areas of the lungs consistent with asbestos. In the dependent areas of the lower lobes, there are also short subpleural lines and arcuate opacities which may represent either pulmonary fibrosis or atelectasis. Dr. Chiles conclusion was that plaintiff has "extensive pleural plaque formation and "moderate asbestosis.
16. Dr. Fred M. Dula, a B-reader, reviewed plaintiffs December 28, 1994 film and found both pleural and parenchymal abnormalities consistent with pneumoconiosis. Dr. Dulas B-read report indicated a profusion rating of 1/2.
17. Dr. John E. Gardella, an internist, expressed the opinion that plaintiff has pleural plaques but not asbestosis. Greater weight is given to the opinion of Dr. Kelling, Dr. Chiles, Dr. Dula, Dr. R. E. Bird, Dr. Terry W. Wallace, Dr. James M. Zuger, Dr. Joel A. Wissing, Dr. James A. Fagan, Dr. Eugenia E. Szontagh, Dr. William M. Clark and Dr. Clifford E. Roemer who indicated that plaintiff has interstitial fibrosis and pleural plaques and/or asbestosis.
18. Throughout plaintiffs 25-year employment with defendant-employer, plaintiff was injuriously exposed to asbestos and asbestos dust. Up to the time plaintiff left his employment with defendant-employer, plaintiff was injuriously exposed to the hazards of asbestos in excess of 30 working days, or parts thereof, within seven consecutive months.
19. Plaintiff contracted asbestosis, a scheduled occupational disease, as a result of his occupational exposure to asbestos.
20. There is no evidence in the record to establish that plaintiff was exposed to the hazards of asbestos subsequent to his employment with defendant-employer.
21. Plaintiff was last injuriously exposed to the hazards of asbestos while employed by defendant-employer and during the period of coverage by Travelers Insurance.
22. Plaintiffs asbestosis was due to causes and conditions characteristic of and peculiar to plaintiffs particular employment with defendant-employer, which is not an ordinary disease of life to which the general public is equally exposed outside of this employment.
23. Plaintiff timely filed his workers compensation claim.
24. This matter was appealed to the Full Commission by defendant-employer and Travelers Insurance from an Opinion and Award awarding benefits and results in the affirmation of that award.
 ***********
Based upon the findings of fact and conclusions of law, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff was, up to the time he left his employment with defendant-employer on June 30, 1993, injuriously exposed to the hazards of asbestos in excess of 30 working days, or parts thereof, within seven consecutive months. This last injurious exposure of plaintiff occurred during the coverage of Travelers Insurance Company. N.C. Gen. Stat. 97-57.
2. Plaintiffs claim for compensation due to asbestosis was timely filed. N.C. Gen. Stat. 97-58.
3. Plaintiff has asbestosis, which is an occupational disease due to causes and conditions characteristic of and peculiar to his employment with defendant-employer and which is not an ordinary disease of life to which the general public is equally exposed. N.C. Gen. Stat. 97-53(24).
4. Plaintiff is entitled to 104 weeks of compensation at the rate of $470.66 per week beginning August 25, 1995 because of his contraction of the occupational disease asbestosis. N.C. Gen. Stat. 97-61.5.
5. Plaintiff is entitled to all medical treatment resulting from his contraction of a compensable occupational disease to the extent that such treatment is designed to effect a cure, give relief or lessen his period of disability. N.C. Gen. Stat. 97-25; 97-25.1.
6. Plaintiff is entitled to receive examinations from the Advisory Medical Committee as a result of his contraction of the occupational disease of asbestosis and to have the amount of permanent impairment determined after his third examination. N.C. Gen. Stat. 97-63.3, 97-61.4
and 97-61.6.
7. Carrier Travelers Insurance Company was on the risk at the time of plaintiffs last injurious exposure and is, therefore, liable for payment of compensation due plaintiff pursuant to the Act. N.C. Gen. Stat. 97-57.
8. Plaintiff is entitled to an attorneys fee assessed against defendant-employer and Travelers Insurance in the amount of $1,200.00 pursuant to N.C. Gen. Stat. 97-88.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. For his compensable occupational disease of asbestosis, defendant-employer and its carrier, Travelers Insurance Company, shall pay 104 weeks of compensation to plaintiff at the rate of $470.66 per week. This compensation has accrued and shall be paid to plaintiff in a lump sum subject to a reasonable attorneys fee approved in Paragraph 2.
2. A reasonable attorneys fee of 25% of the compensation due under Paragraph 1 of this Award is approved for plaintiffs counsel and shall be paid by deducting from that sum and paid directly to plaintiffs counsel.
3. Defendant-employer and its carrier, Travelers Insurance Company, shall pay all medical expenses incurred by plaintiff as a result of his compensable occupational disease.
4. Defendant-employer and its carrier, Travelers Insurance Company, shall bear the costs, including a reasonable attorneys fee in the amount of $1,200.00 to plaintiffs attorney.
This the ___ day of February 2001.
 S/_________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_________________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________________ CHRISTOPHER SCOTT COMMISSIONER